### In re TRONOX, INC. SECURITIES LITIGATION.

#### No. 09 Civ. 6220(SAS).

United States District Court, S.D. New York.

Jan. 5, 2011.

See also 2010 WL 2835545.

Solomon B. Cera, Esq., Gwendolyn R. Giblin, Esq., Thomas C. Bright, Esq., Gold Bennett Cera & Sidener LLP, San Francisco, CA, for Lead Plaintiffs.

Jay B. Kasner, Esq., Susan Saltzstein, Esq., Joseph A. Matteo, Esq., Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Defendants Anadarko Petroleum Corporation and Kerr–McGee Corporation.

Gandolfo V. DiBlasi, Esq., Penny Shane, Esq., Jessica M. Klein, Esq., Sullivan & Cromwell LLP, New York, NY, for Defendants Luke Corbett, Gregory Pilcher, J. Michael Rauh and Robert Wohleber.

Mathew D. Parrott, Esq., Katten Muchin Rosenman LLP, New York, NY, David H. Kistenbroker, Esq., Joni S. Jacobsen, Esq., Katten Muchin Rosenman LLP, Chicago, IL, for Defendants Thomas Adams, Mary Mikkelson and Marty Rowland.

Robert A. Atkins, Esq., Brad S. Karp, Esq., Claudia Hammerman, Esq., Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for Defendant Ernst & Young LLP.

## OPINION AND ORDER

SHIRA A. SCHEINDLIN, District Judge.

### I. INTRODUCTION

This action arises from alleged false and misleading statements made by Tronox, Inc. ("Tronox") during and following its initial public offering in 2005 (the "IPO" or "Tronox IPO"). On June 28, 2010, I issued an Opinion and Order (*"Tronox I"*)[1] ruling on defendants' motions to dismiss various claims asserted in plaintiffs' Consolidated Amended Complaint ("CAC")

---

1. *See In re Tronox, Inc. Sec. Litig.,* No. 09 Civ. 6220, 2010 WL 2835545 (S.D.N.Y. June 28, 2010). This opinion assumes familiarity with the factual background and legal analysis contained in that decision.

and granting plaintiffs leave to replead certain claims. On July 30, 2010, plaintiffs filed their First Amended Consolidated Complaint ("FAC" or "Amended Complaint"). Count IV of that complaint alleges that Kerr–McGee Corporation ("KMG"); Anadarko Petroleum Corporation ("Anadarko") (as successor-in-interest to KMG and pursuant to *respondeat superior*); and Luke Corbett, Robert Wohleber (through the August 10, 2006 "Merger"), and Gregory Pilcher (through August 10, 2006) (collectively, the "KMG Officers") are liable as controlling persons both of Tronox and of the Tronox Officers.[2] KMG and Wohleber now move to dismiss Count IV for the period after the March 31, 2006 "Spin–Off"[3]; Corbett and Pilcher move to dismiss Count IV in full; and Anadarko moves to dismiss Count IV and to strike those allegations pertaining to *respondeat superior* liability. For the following reasons, KMG's motion to dismiss is denied; Anadarko's motion to dismiss is denied in part and granted in part; and the KMG Officers' motion to dismiss is denied in part and granted in part.

2. "Tronox Officers" refers collectively to defendants Thomas Adams, Marty Rowland, Mary Mikkelson, and J. Michael Rauh.

3. "Spin–Off" refers to KMG's distribution of its remaining Tronox shares to KMG shareholders on March 31, 2006. *See* FAC ¶ 15.

4. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir.2007) (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996)).

5. *First Jersey Sec.*, 101 F.3d at 1472–73 (quoting 17 C.F.R. § 240.12b–2). Section 20(a) of the Securities Exchange Act provides:
Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, un-

## II. APPLICABLE LAW

### A. Control Person Liability Under Section 20(a) of the Exchange Act

■ "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."[4]

■ "[C]ontrol over a primary violator may be established by showing that [the controller] possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.' "[5] "Actual control is essential to control person liability."[6] Moreover, "the Section 20(a) defendant must ... have actual control over the *transaction* in question."[7] However, "[f]or purposes of Section 20(a) liability, actual control requires only the *ability* to direct the actions of the controlled person, and not the *active exercise thereof*."[8] "Allegations of influence are not the same as

less the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
15 U.S.C. § 78t(a).

6. *In re Blech Sec. Litig.*, 961 F.Supp. 569, 586–87 (S.D.N.Y.1997).

7. *In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 433, 487 (S.D.N.Y.2005) (quotation marks omitted) (emphasis added). *Accord Anwar v. Fairfield Greenwich Ltd.*, 728 F.Supp.2d 372, 424–25 (S.D.N.Y.2010); *In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910, 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005); *Cromer Fin. Ltd. v. Berger*, 137 F.Supp.2d 452, 484 (S.D.N.Y.2001).

8. *CompuDyne Corp. v. Shane*, 453 F.Supp.2d 807, 829 (S.D.N.Y.2006) (emphasis added and quotation marks omitted).

the power to direct the management and policies of the primary violator." [9] "Status of defendants as directors, 'standing alone, is insufficient to establish their control.' " [10]

■ "Allegations of control are not averments of fraud and therefore need not be pleaded with particularity." [11] Thus, " '[a]t the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard.' " [12] "In the Second Circuit, 'the control person provisions are broadly construed as they were meant to expand the scope of liability under the securities laws.' " [13] "Whether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." [14]

## B. *Respondeat Superior* Liability [15]

■ "*Respondeat superior* imposes liability upon a principal for the torts of [its] agent committed within the scope of their agency relationship." [16] A principal-agent relationship "is created when [1] one party consents to have another act on its behalf, [2] with the principal controlling and directing the acts of the agent." [17] "Under the rubric of agency liability, there

---

**9.** *Fezzani v. Bear, Stearns & Co., Inc.,* 384 F.Supp.2d 618, 645 (S.D.N.Y.2004).

**10.** *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* No. 05 Civ. 1898, 2005 WL 2148919, at *7 (S.D.N.Y. Sept. 6, 2005) (quoting *In re Philip Serv. Corp. Sec. Litig.,* 383 F.Supp.2d 463, 484–85 (S.D.N.Y. 2004)) (citations omitted). *Accord Alstom,* 406 F.Supp.2d at 494 (S.D.N.Y.2005) ("status as officer or committee member is generally not enough to constitute control"); *Food & Allied Serv. Trades Dep't, AFL–CIO v. Millfeld Trading Co.,* 841 F.Supp. 1386, 1391 (S.D.N.Y.1994) ("While courts in this circuit have not always agreed on just how much beyond status as a director must be alleged to plead a Section 20(a) claim ... they have agreed that a bare allegation of director status, without more, is insufficient.").

**11.** *In re Parmalat Sec. Litig.,* 414 F.Supp.2d 428, 440 (S.D.N.Y.2006).

**12.** *In re Scottish Re Group Sec. Litig.,* 524 F.Supp.2d 370, 385 (S.D.N.Y.2007) (quoting *Parmalat,* 414 F.Supp.2d at 440). *Accord In re Converium Holding AG Sec. Litig.,* No. 04 Civ. 7897, 2006 WL 3804619, at *14 (S.D.N.Y. Dec. 28, 2006); *In re WorldCom, Inc. Sec. Litig.,* 294 F.Supp.2d 392, 415–16 (S.D.N.Y. 2003).

**13.** *CompuDyne,* 453 F.Supp.2d at 829 (quoting *Dietrich v. Bauer,* 126 F.Supp.2d 759, 765 (S.D.N.Y.2001) (internal quotation marks omitted)).

**14.** *Id. Accord In re Scottish Re,* 524 F.Supp.2d at 401.

**15.** "Under New York choice of law principles, the law of the state of incorporation determines when the corporate form will be disregarded." *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir.1995) (quotation marks omitted). *See, e.g., Gabriel Capital L.P. v. NatWest Fin., Inc.,* 122 F.Supp.2d 407, 432 (S.D.N.Y.2000). Because Delaware is the state of Anadarko's incorporation, I apply Delaware law to determine whether it may be held liable for the acts of its subsidiary.

**16.** *Khanna v. McMinn,* No. Civ.A. 20545–NC, 2006 WL 1388744, at *28 (Del.Ch. May 9, 2006) (quotation marks omitted). *Accord General Bldg. Contractors Ass'n, Inc. v. Pennsylvania,* 458 U.S. 375, 392, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) ("The doctrine of respondeat superior ... enables the imposition of liability on a principal for the tortious acts of his agent ...."); *Grasty v. Michail,* No. Civ.A. 02C–05–89, 2004 WL 396388, at *2 (Del.Super.Ct. Feb. 24, 2004) ("In Delaware, a parent corporation can be held liable for its subsidiary's actions when the subsidiary is acting as the agent for the principal parent corporation, even when there is no fraud or inequity.").

**17.** *Cochran v. Stifel Fin. Corp.,* No. Civ.A. 17350, 2000 WL 286722, at *17 (Del.Ch. Mar. 8, 2000) (quotation marks and citation omitted), *aff'd in part, rev'd in part on other grounds,* 809 A.2d 555 (Del.2002). This comports with the standard under federal common law. *See In re South African Apartheid Litig.,* 617 F.Supp.2d 228, 272 (S.D.N.Y.2009) ("Under federal common law, the relationship of principal and agent does not obtain unless

are two main theories—actual authority and apparent authority. . . . Actual authority is that authority which a principal expressly or implicitly grants to an agent. . . . Apparent authority is that authority which, though not actually granted, the principal knowingly or negligently permits an agent to exercise, or which he holds him out as possessing." [18]

■■■ "Under the agency theory, the issue of liability rests on the amount of control the parent corporation exercises over the actions of the subsidiary. . . . The parent corporation will be held liable for the activities of the subsidiary only if the parent dominates those activities." [19] "[W]hile one corporation whose shares are owned by a second corporation does not, by that fact alone, become the agent of the second company, a corporation—completely independent of a second corporation—may assume the role of the second corporation's agent in the course of one or more specific transactions." [20] "Circumstantial evidence of a principal-agent relationship includes the exclusive dedication of a subsidiary to assisting the parent company, payment of the subsidiary's expenses by the parent company, and requests for approval of the parent company for important decisions by the subsidiary." [21] "The level of control necessary to form a principal-agent relationship between a parent company and subsidiary defies resolution by mechanical formula[e], for the inquiry is inherently fact-specific." [22]

## C. Successor–in–Interest Liability

■■■ "[A] corporation acquiring the assets of another does not succeed to the liabilities of the successor corporation except where (1) the successor expressly or impliedly assumed the liability; (2) there was a de facto merger of the successor and predecessor; (3) the successor was a mere continuation of the predecessor; or (4) the transaction was fraudulent." [23] The fraud

the parent has manifested its desire for the subsidiary to act upon the parent's behalf, the subsidiary has consented so to act, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors.") (quotation marks and citation omitted).

**18.** *Albert v. Alex. Brown Mgmt. Servs., Inc.,* Nos. Civ.A. 762–N, Civ.A. 763–N, 2005 WL 2130607, at *10 (Del.Ch. Aug. 26, 2005).

**19.** *Grasty,* 2004 WL 396388, at *2 (quotation marks and citation omitted).

**20.** *Alex. Brown,* 2005 WL 2130607, at *9. *Accord Apartheid,* 617 F.Supp.2d at 272 (" '[A] parent corporation is not liable for acts of its subsidiaries simply because it owns the subsidiary's stock.' ") (quoting Restatement (Third) of Agency § 1.01 cmt. f(2)).

**21.** *Apartheid,* 617 F.Supp.2d at 272–73. Compare *Fletcher,* 68 F.3d at 1461–62 ("The presence of a parent's logo on documents created and distributed by a subsidiary, standing alone, does not confer authority upon the subsidiary to act as an agent.").

**22.** *Apartheid,* 617 F.Supp.2d at 272 (quotation marks omitted). *Accord Cochran,* 2000 WL 286722, at *17 ("Under Delaware law, [t]he determination of whether an agency relationship exists is normally a question of fact.") (quotation marks omitted).

**23.** *New York v. National Serv. Indus., Inc.,* 380 F.Supp.2d 122, 128 (E.D.N.Y.2005) (quotation marks and citations omitted). *Accord Great Am. Ins. Co. of N.Y. v. TA Operating Corp.,* No. 06 Civ. 13230, 2008 WL 1848946, at *3 (S.D.N.Y. Apr. 24, 2008) (citing *Polius v. Clark Equip. Co.,* 802 F.2d 75, 78 (3d Cir. 1986)) (applying Delaware law); *United States v. Chrysler Corp.,* Nos. 88 Civ. 341, 88 Civ. 534, 1990 WL 127160, at *4 (D.Del. Aug. 28, 1990); *Rohn Indus. Inc. v. Platinum Equity LLC,* 887 A.2d 983, 996 (Del.Super.Ct.2005), *rev'd on other grounds,* 911 A.2d 379 (Del. 2006).

exception applies only where "the transaction is fraudulent and intended to provide an escape from liability." [24] Federal Rule of Civil Procedure 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." [25]

## III. DISCUSSION

### A. KMG: Control Person Liability After March 31, 2006

In *Tronox I*, I dismissed plaintiffs' claim that "KMG (and, by extension, KMG's officers) retained control of Tronox after March 31, 2006." [26] Plaintiffs had argued that, despite the fact that Tronox became an independent company on April 1, 2006, "KMG retained control after March 31, 2006 by virtue of the Master Separation Agreement ["MSA"]." [27] This argument, I found, "fail[ed] as a result of plaintiffs' own allegations." [28] In particular, plaintiffs had alleged that a condition in the MSA—under which KMG was only responsible for partially reimbursing Tronox for environmental costs after Tronox had already "paid above the amount reserved for specified sites" [29]—rendered the indemnification illusory because "the Chemical Business [did] not have sufficient cash flow to spend the reserved amounts and thus qualify for indemnification." [30] Reasoning that "it is not plausible to think that Tronox was

controlled by an indemnification it could not receive," I held that "this condition in the [MSA] cannot form the basis for plaintiffs' allegation of control." [31] However, I granted plaintiffs leave to replead their control claims based on misstatements made after Tronox's Spin–Off, "to the extent they are able to allege facts, other than the existence of the [MSA], that create a plausible inference that KMG controlled Tronox after March 31, 2006." [32]

Based on "newly discovered information gleaned from Tronox's bankruptcy case that Tronox had received some reimbursement [from KMG] pursuant to the MSA," [33] plaintiffs have removed from their complaint the allegation that indemnification under the MSA was "illusory." Therefore, the grounds on which I previously dismissed plaintiffs' control claims after March 31, 2006, no longer support their dismissal. I now find that the FAC's more fulsome allegations, based on several additional provisions of the MSA and supporting confidential witness ("CW") information,[34] adequately plead that KMG had "actual control over the transaction in question" [35]—namely, Tronox's failure to record reserves for environmental remediation costs and tort claim liabilities that were both probable and reasonably estimable in violation of Generally Accepted Ac-

---

24. *Polius,* 802 F.2d at 78.

25. Fed.R.Civ.P. 9(b).

26. 2010 WL 2835545, at *14.

27. *Id.*

28. *Id.*

29. CAC ¶ 87.

30. *Id.*

31. *Tronox I,* 2010 WL 2835545, at *14.

32. *Id.*

33. Plaintiffs' Memorandum of Law in Opposition to KMG's and KMG Officers' Motion to Dismiss ("Pl. Opp. Mem. to KMG Mem.") at 3 n. 6. *See* FAC ¶ 49 n. 5.

34. The confidential witnesses on whose reports plaintiffs base their allegations occupied positions providing them with personal knowledge as to the facts they reported. *See, e.g., In re Sadia, S.A. Sec. Litig.,* 643 F.Supp.2d 521, 534 (S.D.N.Y.2009).

35. *Alstom,* 406 F.Supp.2d at 487 (S.D.N.Y. 2005) (quotation marks omitted).

counting Principles ("GAAP") after March 31, 2006.[36]

*First,* under the terms of the MSA, KMG had no reimbursement obligation for environmental liabilities without KMG's prior written consent to any material change made by Tronox which increased any reserve amount by $2.5 million or more, or if Tronox established any reserve for a site where none had been previously recorded.[37] "In other words, to the extent that KMG had itself understated the environmental remediation reserves for the sites it transferred to Tronox in connection with the Tronox IPO, KMG ensured that those reserves would continue to be [publicly] understated by Tronox." [38]

*Second,* the MSA *required* Tronox to adopt and use KMG's flawed reserve methodologies for the same remediation sites that were transferred to Tronox [39]— the same improper reserving methodologies that formed the basis for this Court's finding that plaintiffs' primary securities fraud claims against Tronox could proceed. According to plaintiffs, "one Tronox senior manager believed that he could not change the method by which Tronox would [determine] environmental reserves—which was the practice used by [KMG] and approved by [Ernst & Young, LLP]—or the company risked losing whatever indemnity it had." [40] Plaintiffs' theory that KMG controlled Tronox through the MSA is bolstered by the allegation that KMG "imposed" the MSA on Tronox and "unilaterally determined" its content—including "a highly unusual provision" that required *Tronox* to indemnify *KMG* for any material misstatements in the Tronox IPO Registration Statement.[41]

Third, no later than eight business days following the end of each quarter, but prior to the public announcement of Tronox's financial results in an SEC filing or press release, Tronox was required to provide KMG with reserve estimates and any changes in reserve estimates, for the purposes of obtaining KMG's comments and approval prior to filing.[42] The MSA also required Tronox to deliver to KMG—no later than ten business days prior to filing a 10–Q and twelve business days prior to filing a 10–K—drafts of any discussion or analysis of contingent obligations to pay

---

**36.** The MSA has a term of seven years, fully encompassing the Class Period. *See* FAC ¶ 48.

**37.** *See* FAC ¶ 51; 10/24/05 Master Separation Agreement between Kerr–McGee Corporation and Tronox, Inc. ("MSA"), Exhibit A to 9/20/10 Declaration of Solomon B. Cera, counsel to plaintiffs, in Support of Pl. Opp. Mem. to KMG Mem., at 20.

**38.** Pl. Opp. Mem. to KMG Mem. at 3. *See also* FAC ¶ 133 ("The terms of the [MSA] effectively precluded Tronox from changing reserving methodologies by placing at risk [KMG's] indemnity if it did so.").

**39.** *See* FAC ¶ 52; MSA at 46 ("All information provided by any Tronox Group member ... filed with the [SEC] ... will be consistent in terms of detail and otherwise with Parent's [KMG's] policies with respect to the application of GAAP and practices in effect on the Effective Date [of the MSA] ...."); FAC ¶ 133 (showing that Tronox's environmental remediation reserve balances from December 31, 2004, through September 30, 2008(1) fluctuated little and (2) were consistent with the reserve balances of KMG's "Chemicals Segment" in years 2002–2004 (i.e., prior to the Spin–Off)).

**40.** FAC ¶ 109. "One can plausibly infer that the reason KMG imposed this provision on Tronox was to ensure that there would be no disclosure by Tronox of KMG's historically improper reserving practices. Any such disclosure would have unraveled the entire Tronox transaction and revealed it to be, as alleged, a fraud on the public investors in Tronox." Pl. Opp. Mem. to KMG Mem. at 3 n. 5.

**41.** FAC ¶ 421.

**42.** *See id.* ¶¶ 48, 54; MSA at 18–19.

environmental recovery costs (as defined in the MSA) in order to obtain KMG's comments and approval.[43] KMG "made extensive revisions" to drafts of certain "notification letters" provided by Tronox pertaining to environmental reserve issues, was "constantly concerned with limiting assumable liabilities," and "made changes to the drafts that were ultimately incorporated."[44] Tronox employees who interacted with KMG were "constantly frustrated with the numerous changes made to the drafts but were powerless to avoid them."[45]

*Fourth*, KMG and Tronox were "in regular communication."[46] They conducted "Quarterly Meetings" to "discuss remediation activities with respect to Former Operations, *reserve estimates* and matters giving rise to changes in reserves."[47] These meetings were to be conducted prior to Tronox's delivering reserve estimates and any changes thereto to KMG.[48] According to plaintiffs, a Vice–President of Governmental Affairs for Tronox "recalled having numerous conversations while at Tronox with [KMG] and Anadarko personnel in 2006, 2007, and 2008 regarding [KMG's] and then Anadarko's continuous attempts to influence the reserving process."[49]

These allegations support the plausible inference that KMG "controlled the dissemination of the statements in the [SEC filings] that plaintiff[s] allege[ ] were materially false or misleading."[50] For example, it is plausible that through the Quarterly Meetings, KMG ensured that Tronox was responding as intended to the MSA's strong incentives to understate reserves,[51] and that it had the power not only to "influence" Tronox, but to "direct [its] management and policies."[52] Defendants argue that any interaction between KMG and Tronox pursuant to the MSA related solely to whether Tronox would receive any reimbursement from KMG, and reflected no involvement in the amount of reserves Tronox would publicly report.[53]

---

**43.** *See* FAC ¶ 54; MSA at 22. Final versions of such filings were to be delivered to KMG "in form and substance satisfactory to Parent." *Id.* at 42–43, 44.

**44.** FAC ¶ 56.

**45.** *Id.*

**46.** FAC ¶ 50.

**47.** MSA at 19 (emphasis added).

**48.** *See* FAC ¶ 49.

**49.** *Id.* ¶ 57. *See also id.* (alleging that Tronox "took direction from [KMG] on what legal positions it would take in response to claims made by citizens alleging injury from environmental pollution" and "was required by [KMG] to adopt these positions as its own and did so").

**50.** *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F.Supp.2d 429, 468–69 (S.D.N.Y. 2005) (suggesting such allegations would state a claim under Section 20(a)). *Accord Anwar*, 728 F.Supp.2d at 426 (plaintiffs stated a claim under Section 20(a) where plaintiffs alleged that "Citco Group controlled the 'content and dissemination of the statements that were false and misleading' and 'is presumed to have had the power to control or influence the false statements giving rise to the securities violations' committed by the Citco Administrators") (quoting pleadings) (citations omitted).

**51.** See *Tronox I*, 2010 WL 2835545, at *10, *11, *14 n. 198.

**52.** *Fezzani*, 384 F.Supp.2d at 645. The fact that Tronox was also required to obtain KMG's advance written consent for testing, investigation, and sampling at, or any change to, any remediation site—"necessary and fundamental steps to properly establishing reserves"—and that KMG personnel were to be *physically present* only bolsters this inference. Pl. Opp. Mem. to KMG Mem. at 3. *See also* FAC ¶ 53.

**53.** *See* KMG's and KMG Officers' Reply to Plaintiffs' Memorandum in Opposition to KMG's and KMG Officers' Motion to Dismiss ("KMG Reply Mem.") at 3 ("Plaintiffs' argument amounts, at most, to an assertion that

Discovery may prove them right, but plaintiffs' allegations now support the plausible inference that such interactions facilitated and enabled KMG's control of Tronox's reserve reporting. As plaintiffs explain, the reimbursement provisions of the MSA "directly implicate reserves, regardless of whether they also relate to reimbursement calculations." [54] The fact that the MSA did not "give KMG the right to determine what the reserve estimates would be" [55] does not undermine plaintiffs' argument that the MSA was written and implemented in such a way that KMG had the power to effectively control Tronox's reserve estimates without explicitly doing so. That section 2.5(i) of the MSA "self-servingly recites that KMG's role in receiving notice, monitoring, overseeing, and providing consent, relate to whether KMG is obligated to provide reimbursement" [56] is entirely consistent with the "gravaman" of plaintiffs' complaint: "that KMG and others engaged in a deliberate fraud whereby KMG ridded itself of the Legacy Liabilities by transferring them to Tronox and in turn controlled Tronox's management and reporting of these obligations through the MSA and otherwise." [57]

## B. Anadarko
### 1. Control Person Liability After March 31, 2006

█ Anadarko argues that "Plaintiffs' Section 20(a) claim against Anadarko runs afoul of the undisputed fact that Anadarko is not even a party to the MSA, the document Plaintiffs contend provided KMG with the ability to exercise control over Tronox after the Spin–Off." [58] However, plaintiffs have alleged that not only KMG, but also Anadarko, were "deeply involved in the process of determining Tronox's remediation obligations and reserves, the core of the fraud alleged in the FAC." [59] Indeed, plaintiffs allege virtually identical involvement of KMG and Anadarko in the implementation of the MSA. [60] Moreover, Anadarko represented in its 2006 and 2007 Annual Reports that " '[a]s a result of the merger, we will be responsible to provide reimbursements to Tronox pursuant to the [MSA], and we may be subject to potential joint and several liability, as the successor to [KMG], if Tronox is unable to perform certain remediation obligations.' " [61] According to plaintiffs, as of June 29, 2010, and "pursuant to the [MSA]," Anadarko had paid Tronox approximately $4.1 million in environmental response costs, and it has reserved approximately $96 million in remaining reimbursement obligations. [62]

---

KMG had an opportunity to discuss Tronox's reserves before they were finalized."); *id.* at 2; KMG's and KMG Officers' Memorandum of Law in Support of Motion to Dismiss ("KMG Mem.") at 4.

54. Pl. Opp. Mem. to KMG Mem. at 7–8. *See also id.* at 9 n. 11 ("One cannot reasonably separate the issue of reimbursement obligations from involvement in setting the reserves. The two are inextricably linked.").

55. KMG Mem. at 4.

56. Pl. Opp. Mem. to KMG Mem. at 9 n. 11.

57. *Id.* at 10.

58. Anadarko's Reply to Plaintiffs' Memorandum in Opposition to Anadarko's Motion to Dismiss ("Anadarko Reply Mem.") at 5.

59. Plaintiffs' Memorandum of Law in Opposition to Anadarko's Motion to Dismiss ("Pl. Opp. Mem. to Anadarko Mem.") at 9.

60. *See* FAC ¶¶ 48–59.

61. *Id.* ¶ 127 (quoting Annual Reports).

62. *See id.* ¶ 49 n. 5. *See also id.* ¶ 270 (quoting defendant Adams' statement, during the third quarter of 2007, that Tronox pursued "Anadarko reimbursements").

Moreover, during a conference call on February 3, 2008, defendant Adams—then–CEO of Tronox—stated that, "under the [MSA], we continually have dialogues with Anadarko concerning our ongoing programs and legacy environmental [sic] . . . [W]e work with [Anadarko] continuously." [63] Together these allegations support an inference that Anadarko was deeply involved in Tronox's day-to-day operations [64] as they pertained to the transaction at issue—Tronox's reporting of reserves—and provide Anadarko with "fair notice" [65] of the control claim against it.[66]

## 2. Respondeat Superior Liability

Plaintiffs also seek to establish Anadarko's liability on the basis of *respondeat superior* for KMG's primary violation "in controlling the reporting of Tronox's reserves." [67] Plaintiffs articulate their theory of *respondeat superior* liability in their Opposition brief:

> Anadarko is properly alleged to be responsible for the tortious acts of its agent, KMG, in controlling the reporting

of Tronox's reserves. The confidential witness allegations, and public statements of Tronox's CEO show that, following the merger, Anadarko allowed KMG to interact with Tronox in addressing the issues regarding Tronox's environmental reserves and remediation costs, including issues arising under the MSA. Anadarko at all times maintained control over these activities, especially in light of its acknowledged responsibility, as KMG's successor, to pay any remediation obligations which Tronox could not satisfy.[68]

Anadarko argues that the paragraphs of the FAC on which this argument is based "relate only to KMG's alleged 'ability to exercise control' over *Tronox*—not to Anadarko's relationship to KMG." [69] Instead, "the sole bases for Plaintiffs' allegation of a principal-agent relationship between Anadarko and KMG [in the FAC] are (i) Anadardo and KMG's 'parent-subsidiary relationship' and (ii) 'the merger agreement dated as of June 22, 2006' " [70]—allegations insufficient to allege the existence of a principal-agent relationship.[71]

---

63. *Id.* ¶ 58.

64. *See Anwar,* 728 F.Supp.2d at 427 (defendant's oversight of "day-to-day operations" made it "at least plausible that [defendant] exerted actual control over the fraudulent transaction at issue."); *Cornwell v. Credit Suisse Group,* 689 F.Supp.2d 629, 639 (S.D.N.Y.2010) (control sufficiently alleged "[b]y virtue of [defendants'] 'direct and supervisory involvement in the day-to-day operations of' " primary violator); *In re Refco, Inc. Sec. Lit.,* 503 F.Supp.2d 611, 660–63 (S.D.N.Y.2007) (plaintiffs stated a Section 20(a) claim where defendants were allegedly " 'deeply involved in the day-to-day management' "); *In re Scottish Re,* 524 F.Supp.2d at 401.

65. *In re Scottish Re,* 524 F.Supp.2d at 386.

66. Plaintiffs' allegations also support the inference that KMG and Anadarko consciously engaged in a cover-up so that the control they exercised over Tronox could not be revealed. *See* FAC ¶ 55. For example, based on infor-

mation obtained from "CW 15," a Vice–President of Safety & Environmental Affairs, KMG and Anadarko made it a point to refrain from generating any documents that might appear to confirm their exercise of control. *See id.; see also id.* ¶ 56 (alleging that senior KMG and Anadarko personnel issued a directive to Tronox to avoid creating a record of revisions made to the notification letters so as to limit any documentation that showed KMG's and Anadarko's control of Tronox).

67. Pl. Opp. Mem. to Anadarko Mem. at 10.

68. *Id.*

69. Anadarko Reply Mem. at 5.

70. Anadarko's Memorandum of Law in Support of Motion to Dismiss ("Anadarko Mem.") at 10 (quoting FAC ¶ 424).

71. *See id.* at 9. Anadarko also moves to strike the *respondeat superior* allegations as barred by my order in *Tronox I* granting plaintiffs

■ Although plaintiffs' *argument for* liability based on *respondeat superior* may not be fully articulated in the FAC, they have "pl[ed] facts giving rise to a plausible inference that [KMG] possesses either actual or apparent authority to act on behalf of [Anadarko]." [72] Specifically, plaintiffs' allegations regarding the MSA and its implementation render plausible (1) that Anadarko consented to KMG's acting on its behalf in implementing the terms of the MSA and (2) that Anadarko controlled and directed KMG's actions. [73]

*First,* plaintiffs' allegations support the inference that KMG was acting on Anadarko's behalf, with Anadarko's consent, in implementing the terms of the MSA. Given—as defendant notes—that "Anadarko is not even a party to the MSA," [74] Anadarko's assumption of responsibility for KMG's reimbursement obligations *pursuant* to the MSA [75] raises the plausible inference that Anadarko consented to KMG's *acting on its behalf* in implementing the MSA's terms. Stated in terms of apparent authority, in light of Anadarko's

"acknowledged responsibility, as KMG's successor, to pay any remediation obligations which Tronox could not satisfy," [76] KMG "[held] itself out as possessing" [77] the authority to act on Anadarko's behalf in implementing the terms of the MSA.

*Second,* plaintiffs have adequately alleged that Anadarko controlled and directed KMG's actions in implementing the terms of the MSA. Plaintiffs have alleged Anadarko's "deep involvement ... in the reserving process following its acquisition of [KMG] in August 2006." [78] That these allegations support the plausible inference that *KMG* controlled *Tronox* does not preclude a finding, at the motion to dismiss stage, that Anadarko also controlled and directed KMG. Given that Anadarko is not even a party to the MSA, Anadarko's "continuous attempts to influence the reserving process" [79] would necessarily result from its control and direction of KMG, the party to whom Tronox was required to deliver quarterly and annual reports and other public filings "in form and substance satis-

leave to replead "their allegations relating to the claim that Anadarko is liable as a successor-in-interest to KMG." *Tronox I,* 2010 WL 2835545, at *16. *See* Anadarko Mem. at 8–9; Anadarko Reply Mem. at 4 n. 6. Although "successor-in-interest liability and the doctrine of *respondeat superior* are distinct theories of liability," Anadarko Mem. at 4 n. 6, plaintiffs correctly note that their *respondeat superior* claims are "an adjunct to the successor-in-interest claim," Pl. Opp. Mem. to Anadarko Mem. at 9 n. 10. *See Tronox I,* 2010 WL 2835545, at *8 n. 120 (categorizing *respondeat superior* as one "theory of vicarious liability"). Therefore, I deny Anadarko's motion to strike these allegations. *See Illiano v. Mineola Union Free School Dist.,* 585 F.Supp.2d 341, 357 (E.D.N.Y.2008) ("Motions to strike are generally disfavored, and should be granted only when there is a strong reason for doing so.") (quotation marks and citation omitted).

72. Anadarko Mem. at 9 (explaining what plaintiffs must plead to survive a motion to

dismiss their claim for *respondeat superior* liability).

73. *See Cochran,* 2000 WL 286722, at *17.

74. Anadarko Reply Mem. at 5.

75. *See* FAC ¶¶ 49 n. 5, 127, 128. *See also* discussion *supra* Part III.B.1.

76. Pl. Opp. Mem. to Anadarko Mem. at 10.

77. *Alex. Brown,* 2005 WL 2130607, at *10.

78. FAC ¶ 58. *See* discussion *supra* Part III. B.1. *See, e.g., Wiwa v. Royal Dutch Petroleum Co.,* No. 96 Civ. 8386, 2002 WL 319887, at *13 n. 14 (S.D.N.Y.2002) ("By involving themselves directly in [the subsidiary's] activities, and by directing these activities, [the parent companies] made [their subsidiary] their agent with respect to the torts alleged in the complaint.").

79. FAC ¶ 57.

factory to [KMG]."[80] Moreover, the statement by Adams during the February 2008 conference call—that *"under the [MSA], we continually have dialogues with Anadarko concerning our ongoing programs and legal environmental [sic] .... [W]e work with [Anadarko] continuously"*[81]—it is plausible that Anadarko not only controlled Tronox, but also directed and controlled KMG in the implementation of the MSA. For these reasons, Anadarko's motion to dismiss plaintiffs' *respondeat superior* claim is denied.

### 3. Successor–in–Interest Liability

#### a. Express or Implied Assumption of KMG's Liabilities

■ The FAC adds no material allegations on which to sustain plaintiffs' claim that Anadarko expressly or impliedly assumed KMG's liability for securities fraud actions relating to the Tronox IPO. Instead, the claim remains entirely based on (1) Anadarko's acknowledgment of its potential liability as a successor-in-interest to KMG for environmental remediation costs[82] and (2) Anadarko's contractual agreement, together with KMG, to indemnify KMG's officers and directors for their acts or omissions occurring before the acquisition date.[83] These allegations fail to state a claim for successor liability based on express or implied assumption of liabilities.[84]

#### b. Fraud

Plaintiffs now claim that

Anadarko is liable as a successor-in-interest to KMG because its merger with that company constituted the culmination of the fraud alleged in the FAC whereby the Legacy Liabilities were excised out of KMG and transferred to Tronox, for the purpose of allowing Anadarko to acquire KMG free and clear of such obligations. These transactions ... were part of a deliberate plan, scheme, and artifice to defraud whereby the Legacy Liabilities were imposed on the public shareholders of Tronox without disclosure of their true magnitude and with the goal of KMG and Anadarko fraudulently escaping these liabilities.[85]

■ Anadarko moves to dismiss this claim on the grounds that plaintiffs have "improperly conflated the merger with the IPO and Spin Off":[86] because the Legacy Liabilities were allegedly transferred to Tronox prior to the merger, Anadarko argues, the merger was not the "final step" in escaping the obligations arising from the Legacy Liabilities.[87] I agree. Plaintiffs' allegations do not support an inference that *Anadarko's acquisition of KMG*—the "transaction" at issue in this claim—was "fraudulent and intended to provide an escape from liability."[88] The fact that "Anadarko ... knew that KMG had gone from billions of dollars in environmental remediation liabilities to effectively zero in a very short timeframe"[89] or that "[a]bsent KMG's ability to represent it had no or limited exposure, the merger would not have occurred"[90] does not sup-

---

80. MSA at 42–43, 44.

81. FAC ¶ 58.

82. *See id.* ¶ 128.

83. *See id.* ¶ 66.

84. *See Tronox I,* 2010 WL 2835545, at *15–16; *Great Am. Ins. Co. of N.Y.,* 2008 WL 1848946, at *4 ("[T]he fact that the defendants agreed to indemnify each other does not lead to the conclusion that the [parent] agreed to assume any additional liabilities.").

85. Pl. Opp. Mem. to Anadarko Mem. at 3–4.

86. Anadarko Mem. at 6.

87. *Id.* at 2.

88. *Polius,* 802 F.2d at 78.

89. Pl. Opp. Mem. to Anadarko Mem. at 5.

90. *Id.* at 6.

port a theory that the *merger* was fraudulent.[91] This is because the "merger by which a so-called 'clean' KMG became a subsidiary of Anadarko could not possibly have 'provide[d] an escape from' the so-called 'Legacy Liabilities,' as the merger did not affect the ownership of those liabilities ... in the first place."[92] Therefore, Anadarko's motion to dismiss plaintiffs' claim for successor liability is granted.

## C. KMG Officers: Control Person Liability

In Count IV of the FAC, plaintiffs allege that Corbett (for the entire Class Period), Wohleber (through August 10, 2006), and Pilcher (through August 10, 2006) "were controlling persons of Tronox and the officers of Tronox ... within the meaning of Section 20(a) of the Exchange Act."[93] As support for that claim, they allege that Corbett, Wohleber, and Pilcher, along with KMG, "devised and effectuated the fraudulent scheme and course of conduct alleged herein"; "created the plan to remove the Legacy Liabilities from [KMG] and place them into Tronox without making full and adequate disclosure[s]"; "planned and effectuated [KMG's] extrication from further association with Tronox except through a

modest indemnification obligation reflected in the [MSA], by completing the Spin–Off"; "unilaterally determined the content of all material agreements between [KMG] and Tronox and dictated the terms of the transactions described hereinabove"; and "imposed" the MSA on Tronox.[94]

Building on these allegations, plaintiffs argue that, as senior officers of (and/or general counsel for) KMG from March 31, 2006, to August 10, 2006—when KMG controlled Tronox by virtue of the MSA[95]— Corbett, Wohleber, and Pilcher "continued to exercise control over Tronox."[96] Plaintiffs assert that these senior officers "can be presumed to have received reports regarding Tronox's ongoing environmental remediation work, the setting of the reserves, and to have directed KMG's positions vis-a-vis Tronox."[97] Because they were "responsible for and had knowledge of KMG's financial reporting, which included the reimbursement obligations and related amount of Tronox reserves," they controlled this aspect of Tronox's financial reporting "inasmuch as KMG" did.[98]

Corbett and Pilcher now move to dismiss Count IV in full,[99] and Wohleber moves to dismiss Count IV for the period after March 31, 2006.[100] As an initial mat-

---

91. *See Sunnyside Dev. Co. v. Opsys Ltd.*, No. C 05 0553, 2007 WL 2462142, at *2, *11 (N.D.Cal. Aug. 29, 2007) (fraud exception did not apply where acquiror "made it clear to [seller] that it had no interest in the California assets and business, and that any deal would require a clean separation of the U.S. operations from the UK operations" that the buyer purchased).

92. Anadarko Mem. at 6 (quoting *Polius*, 802 F.2d at 78).

93. FAC ¶¶ 420–421.

94. *Id.* ¶ 421.

95. *See* discussion *supra* Part III.A.

96. Pl. Opp. Mem. to KMG Mem. at 9.

97. *Id.*

98. *Id.*

99. From November 21, 2005 through August 10, 2006, Corbett was the Chairman and CEO of KMG; Pilcher served as Senior Vice President, Secretary, and General Counsel of KMG. *See id.* ¶¶ 37–38.

100. Wohleber served as Chairman of the Board and a Director of Tronox from November 21, 2005 through March 31, 2006, during which time he signed various Tronox SEC filings. *See id.* ¶ 34. Wohleber does not move to dismiss plaintiffs' control allegations against him from the IPO to the Spin–Off, focusing instead on the later time, when he served solely as an officer of KMG (Senior Vice President and Chief Financial Officer). *See id.*

ter, I note that although the KMG Officers' motion divides the Class Period into three distinct periods of time for the purpose of analyzing plaintiffs' control allegations—the time periods (1) between the IPO and the Spin–Off, (2) between the Spin–Off and the Merger, and (3) after the Merger—plaintiffs make little distinction among these time periods. Below, I address in turn (1) the period of time from the IPO to the Merger and (2) the period of time after the Merger.

### 1. Control Person Liability from November 21, 2005 to March 31, 2006 (Corbett and Pilcher) and from April 1, 2006 to August 10, 2006 (Corbett, Pilcher, and Wohleber) [101]

Defendants argue that Corbett's and Pilcher's "role as officers of KMG between the time of Tronox's IPO and Spin–Off"—a period of time during which plaintiffs have alleged *KMG* controlled Tronox [102]—"does not amount to an allegation of control under Section 20" [103] because

> [t]here are no allegations that [from November 21, 2005, to March 31, 2006] either Corbett or Pilcher owned a controlling amount of Tronox voting shares, were officers or directors of Tronox, were involved in the day-to-day activities of Tronox, or signed any of Tronox's filings. More specifically, there is no allegation that Corbett or Pilcher were involved in Tronox's reserve-setting process or the management of Tronox.[104]

Therefore, according to defendants, plaintiffs' control claims boil down to mere assertions of Corbett's and Pilcher's "status" as officers of KMG, which is "generally not enough to constitute control." [105]

Defendants similarly argue that plaintiffs' control argument for the period from March 31, 2006 to August 10, 2006, is a concession that their claim against Corbett, Pilcher, and Wohleber is based solely

**101.** Plaintiffs assert that "Wohleber, Corbett, and Pilcher have been properly alleged to be control persons of Tronox through March 31, 2006," citing *Tronox I*, 2010 WL 2835545, at *14. However, "[t]he only 'control' issue raised in the [last round of] motions to dismiss [was] whether KMG (and by extension, KMG's officers) retained control of Tronox *after March 31, 2006.*" *Id.* (emphasis added). Moreover, the KMG Officers had relied on plaintiffs' purported failure to allege a primary violation to argue, in their first motion to dismiss, that I should dismiss plaintiffs' control allegations. *See* 1/19/10 KMG Officers' Memorandum of Law in Support of Motion to Dismiss (Docket No. 69) at 14. Thus, because I did not specifically address whether plaintiffs had adequately pled control of Tronox by Wohleber, Corbett, and Pilcher before March 31, 2006, I now consider Corbett's and Pilcher's argument as it pertains to that time period.

**102.** KMG does not now argue that plaintiffs have failed to state a claim that KMG controlled Tronox from the IPO to the Spin–Off. There is no question that plaintiffs have made such allegations. *See* 2/26/10 Plaintiffs' Memorandum in Opposition to KMG's, Anadar-

ko's, and the Individually Named Defendants' Motion to Dismiss (Docket No. 78) at 48 n. 57 ("KMG's control over Tronox prior to March 31, 2006, is evidenced by the fact that, among other things, KMG: (1) planned and effectuated the fraudulent IPO scheme alleged in the Complaint; (2) owned 88.7% of the total voting power of all classes of Tronox stock, including 56.7% of the outstanding Tronox Class B shares; (2) received $804 million of the $844 million in proceeds and secured credit facility monies raised through the IPO; (3) assigned two of its executives, Defendants Rauh and Wohleber, to Tronox's Board of Directors; and (4) had complete control over the [MSA].") (citations omitted); FAC ¶ 46 (" 'Upon the closing of this [IPO], ... [KMG] will be able to control, directly or indirectly ... all matters affecting us ....' ") (quoting Tronox's Registration Statement and Prospectus).

**103.** KMG Mem. at 10.

**104.** *Id.*

**105.** *Alstom*, 406 F.Supp.2d at 494. *See* cases cited *supra* note 10.

" 'on [their] status as [ ] officer[s] of KMG.' "[106] Defendants argue that, because plaintiffs never suggest that unidentified KMG "personnel" or "employees" involved in the implementation of the MSA "included any of the named individual defendants," plaintiffs "do not and cannot assert that [Corbett, Pilcher, or Wohleber] had any hand in alleged exercises of control by KMG," rendering their control claims "impermissibly tertiary."[107]

▇ It is true that plaintiffs have not explicitly alleged the quintessential markers of control against Corbett, Pilcher, and Wohleber. For example, there is no allegation that from November 21, 2005 through March 31, 2006, either Corbett or Pilcher signed Tronox's allegedly fraudulent public filings,[108] or that any of the KMG Officers were directly involved in Tronox's day-to-day operations.[109] Howev-er, in light of plaintiffs' allegations (1) that Corbett, Pilcher, and Wohleber "devised and effectuated the fraudulent scheme"[110] and that (2) KMG controlled Tronox from the IPO to the Spin–Off to the Merger, I find their allegations sufficient to support the plausible inference that the KMG Officers had the " '*power* to direct or cause the direction of the management and policies of [Tronox]' "[111] during that time period.[112] Corbett and Pilcher may not have signed Tronox's filings during this time—because they were not Tronox officers—but they allegedly "created the plan to remove the Legacy Liabilities from [KMG] and place them into Tronox without making full and adequate disclosure[s]" and "dictated the terms of the [IPO],"[113] rendering plausible the inference that they had the power to control the content of Tronox's company press releases[114] and public filings.[115]

**106.** KMG Reply Mem. at 4 (quoting Pl. Opp. Mem. to KMG Mem. at 9).

**107.** *Id.* at 5.

**108.** *See Jacobs v. Coopers & Lybrand, L.L.P.,* No. 97 Civ. 3374, 1999 WL 101772, at *17 (S.D.N.Y. Mar. 1, 1999) (it "comport[s] with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report"). *See also In re Scottish Re,* 524 F.Supp.2d at 401–02; *Flag Telecom,* 352 F.Supp.2d at 468–69; *In re CINAR Corp. Sec. Litig.,* 186 F.Supp.2d 279, 309 (E.D.N.Y.2002); *In re Leslie Fay Cos., Inc. Sec. Litig.,* 918 F.Supp. 749, 763 (S.D.N.Y.1996).

**109.** *See* cases cited *supra* note 64.

**110.** FAC ¶ 421. *Accord* FAC ¶¶ 4 (Corbett, Wohleber, and Pilcher were "instrumental in planning and effectuating the transfer of the environmental remediation and tort liabilities to Tronox prior to the IPO"), 16 (Pilcher was a "moving force behind the fraudulent plan"), 37 (alleging Corbett's "involvement in developing the plan to create Tronox, dumping the Legacy Liabilities on Tronox, entering into the [MSA], and planning the Tronox IPO and subsequent Spin–Off"), 38 (same for Pilcher), 105 (alleging Corbett's and Wohleber's approval of the separation of KMG's Chemical Business), 125 (alleging Corbett was "a primary architect" and Wohleber and Pilcher "architects" of the fraud), 145 (Corbett and Wohleber were " 'heavily involved' " in the decision to " 'dump' " Legacy Liabilities) (quoting an Environmental Manager and Business Manager for the Health, Safety, and Environmental Group at both KMG and Tronox between 1984 and 2008).

**111.** *First Jersey Sec.,* 101 F.3d at 1472 (quoting 17 C.F.R. § 240.12b–2) (emphasis added).

**112.** I note that while courts in this Circuit have repeatedly addressed (a) the standards for alleging control against individuals who served as directors and officers of *primary violators,* few cases have squarely addressed (b) the standards for alleging individuals' control of entities that in turn controlled primary violators—e.g., Corbett's, Wohleber's, and Pilcher's liability based on their control of Tronox vis-a-vis KMG.

**113.** FAC ¶ 421.

**114.** *See, e.g., id.* ¶ 94 (reciting Corbett's statement in a March 8, 2005 press release that "[f]or some time, the Board has been considering the separation of chemical [sic], current market conditions for this industry now make

Similarly, plaintiffs' allegations against all three officers during the time that KMG controlled Tronox via the MSA exceed mere "control person status." All three defendants allegedly "planned and effectuated [KMG's] extrication from further association with Tronox except through a modest indemnification obligation reflected in the [MSA], by completing the Spin–Off"; and "unilaterally determined the content of [the MSA]" and "imposed" it on Tronox.[116] When KMG was ultimately sold to Anadarko—a transaction made possible by the allegedly fraudulent Spin–Off of Tronox orchestrated by these officers—Corbett profited by over $270 million; Wohleber by roughly $26 million; and Pilcher by roughly $32 million.[117] Based on these allegations, it is plausible that these defendants had the power to, and in fact did, dictate Tronox's misleading environmental remediation reserves.[118]

Such allegations place this case in stark contrast to those relied upon by defendants for the proposition that plaintiffs

cannot state a claim based on "tertiary liability."[119] In *Fezzani v. Bear, Stearns, & Co.*, plaintiffs sought to hold a senior officer of Bear Stearns, which in turn allegedly controlled the primary violator (Baron), "responsible based on tertiary liability—his control of Bear Stearns, which in turn allegedly controlled Baron."[120] The court held that plaintiffs could not "stretch the concept of .control liability so far."[121] However, in that case, the court had already *dismissed* plaintiffs' control claims against Bear Stearns as time-barred. If the court had reached the "merits" of plaintiffs' control allegations against Bear Stearns—that it "took over Baron's offices and executed transactions, as well as approved or disapproved of all of Baron's trading orders after November 1995" and subsequently "assumed control of all trading activities at Baron and sent its employees to Baron's offices to enforce that control"[122]—it may well have found that plaintiffs stated a claim against Bear Stearns, and seriously considered whether the senior officer, too, could be found to

---

it an ideal time to unlock this value for our stockholders").

**115.** See *Teamsters*, 2005 WL 2148919, at *15 (because plaintiffs alleged that individual officers of the primary violators "control[led] the contents of the various SEC filings, press releases and other public statements" of the primary violator, the complaint did "not rely on status alone" and therefore adequately pled Section 20(a) claims against those individual defendants). *Accord In re Quintel Entm't Inc. Sec. Litig.*, 72 F.Supp.2d 283, 289 (S.D.N.Y.1999).

**116.** FAC ¶ 421.

**117.** See *id.* ¶¶ 16, 165.

**118.** I also note that although the attribution requirement of *Pacific Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144 (2d Cir. 2010), precludes plaintiffs from bringing a Section 10(b) claim against these officers, to hold that there is no theory on which plaintiffs may state a claim against them would undermine Congress's intent in creating con-

trol liability. The "control person" provisions were included in the federal securities laws to "prevent people and entities from using 'dummies' to do the things that they were forbidden to do by the securities laws." *Ross v. Bolton*, No. 83 Civ. 8244, 1989 WL 80428, at *3 (S.D.N.Y. Apr. 4, 1989) (citing *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 812 (2d Cir.1975)). While plaintiffs do not contend that Tronox or its officers were mere "dummies," see Pl. Opp. Mem. to KMG Mem. at 10, the FAC supports the plausible inference that the KMG officers had the power to direct, and actually did direct, the reserve-reporting policies of Tronox—to do the things that they were forbidden to do by the securities laws.

**119.** KMG Reply Mem. at 5.

**120.** 384 F.Supp.2d at 646 n. 10.

**121.** *Id.*

**122.** *Id.* at 646.

control Baron vis-a-vis his position at Bear Stearns. Even if it had not, the control allegations here are factually distinct from those at issue in *Fezzani*, because plaintiffs are alleging more than "[p]artic-ipation, even significant participation, in [the primary violator's] scheme to de-fraud." [123] They are alleging that Corbett, Pilcher, and Wohleber *were* the master-minds behind a scheme to defraud that culminated in Tronox's Spin–Off from KMG, saddled with liabilities that Tronox's public filings continually understated throughout the Class Period.[124]

*Teamsters Local 445 Freight Division Pension Fund v. Bombardier Inc.*[125] is also distinguishable. In that case, I held that an allegation that an individual defendant ("Beaudoin") was an officer and director of *a parent corporation* ("BI") of a primary violator ("BCM" and "BCI" (collectively "Bombardier")) was insufficient to plead a claim under Section 20(a).[126] The com-plaint alleged that Beaudoin, as a signato-ry of BI's Annual Reports, had direct knowledge of the "Certificate Offerings" that were reflected in BI's financial state-ments and incorporated in BI's Annual Reports.[127] I first rejected plaintiffs' pri-mary securities fraud allegations against Beaudoin because "the Complaint does not allege that Beaudoin knew of information contradicting [BCM's and BCI's] public statements .... Nor does plaintiff allege that the Certificate Offerings were a core operation of BI." [128] By contrast, plaintiffs here have alleged that Corbett, Pilcher, and Wohleber—who allegedly orchestrated the plan by which the Legacy Liabilities were excised from KMG and who "unilat-erally determined the content of" the MSA which they "imposed" on KMG [129]—knew of information contradicting the reserves reported by Tronox.[130] Moreover, unlike the KMG Officers in this case, Beaudoin was not alleged to have "controlled [BCM and BCI], nor [did plaintiffs] make any specific allegation of control against him other than his status as an officer and director." [131] Instead, the complaint mere-

---

123. *Id.*

124. *See* Pl. Opp. Mem. to KMG Mem. at 10; *supra* note 110.

125. 2005 WL 2148919.

126. *Id.* at *15. The alleged fraud in that case concerned certain Certificates offered by Bombardier. "The gravamen of plaintiff's al-legations [was] that defendants engaged in a scheme to defraud investors through misrep-resentations and omissions regarding the in-tegrity of [Bombardier's] underwriting stan-dards for loan origination ...." *Id.* at *1.

127. *Id.* at *15.

128. *Id.* at *14–*15. *See also Alstom*, 406 F.Supp.2d at 496 (rejecting control allega-tions against the CEO of a company whose wholly-owned subsidiary allegedly committed fraud because "the Complaint contain[ed] no allegations supporting any reasonable infer-ence that [the CEO] knew or should have known about the [subsidiary's fraud]").

129. FAC ¶ 421.

130. *See id.* ¶¶ 39 (Corbett, Pilcher, and Woh-leber "had access to the material adverse undisclosed information about the true extent of the Legacy Liabilities and the material defi-ciency in reserves recorded by Tronox" and "had access to internal Tronox and [KMG] corporate documents, including drafts and fi-nal copies of Tronox's press releases and its Forms 10–K and Forms 10–Q, as well as the operating plans, budgets, forecasts and re-ports of operations prepared by Defendants ....."), 102 (KMG's senior officers "knew that the Chemical Business did not have sufficient assets as a stand-alone entity to support the ongoing maintenance of [the] Legacy Liabili-ties"), 423 (Wohleber in particular "was fully knowledgeable as to the scope of the Legacy Liabilities and the fact that both [KMG] and Tronox had failed to record adequate re-serves.").

131. *Teamsters*, 2005 WL 2148919, at *15.

ly "contain[ed] a number of allegations that the 'Individual Defendants' [including Beaudoin] had control over the 'the Company' " [132]—which included BI, BCI, and BCM. Plaintiffs' allegations here go beyond such broad, conclusory assertions.[133] A company acts through its officers, and plaintiffs have alleged sufficient facts to support the inference that, as the perpetrators of the fraud and as senior officers of KMG, Corbett, Pilcher, and Wohleber effectuated the control injected into the relationship between KMG and Tronox (1) from the IPO to the Spin–Off (via stock ownership) and (2) from the Spin–Off to the Merger (via the MSA).[134]

### 2. Corbett: Control Person Liability from August 11, 2006 to January 12, 2009

 Plaintiffs do not explain their theory for how Corbett was a "controlling person" of Tronox after the August 10, 2006 merger.[135]

Although Plaintiffs' basis for asserting control for this time period is entirely unstated, it can be inferred that it is based solely on the fact that Corbett became an outside director of Anadarko, whereas Pilcher and Wohleber had no role at Anadarko. Plaintiffs are apparently alleging that—after Anadarko's acquisition of KMG—Corbett, as an outside director, controlled Anadarko, which in turn is allegedly liable (as a successor-in-interest or on a theory of *respondeat superior*) for KMG's alleged control over Tronox.[136]

This theory is "yet another step removed from 'control person' liability." [137] Plaintiffs have failed to articulate how Corbett continued to control Tronox—vis-a-vis Anadarko vis-a-vis KMG—beyond asserting his status as an outside director of Anadarko. In the absence of additional allegations, plaintiffs' Section 20(a) claim is too attenuated to state a claim against Corbett for control liability after the Merger.

## IV. CONCLUSION

For the aforementioned reasons, KMG's motion to dismiss is denied; Anadarko's motion to dismiss plaintiffs' *respondeat superior* and Section 20(a) claims is denied;

132. *Id.*

133. Defendants' reliance on *In re Alstom SA Sec. Litig.* is also misplaced. Although the *Alstom* court dismissed plaintiffs' claim that Alstom's CEO controlled Alstom's wholly-owned subsidiary, ATI, by virtue of his status as Alstom's CEO, it suggested that plaintiffs might have stated a claim had they explicitly "state[d] that ATI was controlled [by Alstom] through stock ownership" and pled that the CEO was a "culpable participant" in ATI's fraud. 406 F.Supp.2d at 495–96. Here, plaintiffs have adequately pled that KMG controlled Tronox from the IPO to the Spin–Off (through stock ownership) and from the Spin–Off to the Merger (through the MSA and its implementation), and have alleged that Corbett, Pilcher, and Wohleber not only knew about, but were responsible for, the alleged fraud. *See supra* note 130.

134. This is especially true in light of plaintiffs' allegations that KMG consciously engaged in a cover-up so that the control it exercised over Tronox could not be revealed. *See supra* note 66.

135. *See, e.g.,* FAC ¶ 37 ("Corbett was a control person of Tronox based on his involvement in developing the plan to create Tronox, dumping the Legacy Liabilities on Tronox, entering into the [MSA], and planning the Tronox IPO and subsequent Spin–Off.").

136. *See* KMG Mem. at 9.

137. *Id. See In re Alstom,* 406 F.Supp.2d at 495 ("[M]ere *status* as a board member is not enough to demonstrate actual control over the company and the transaction in question and the Complaint does not contain any allegations from which it can be inferred that [the individual defendant] exercised actual control over Alstom after he stepped down as CEO.") (citations omitted).

Anadarko's motion to dismiss plaintiffs' successor liability claim is granted; the KMG Officers' motion to dismiss is denied for the period before August 10, 2006; and Corbett's motion to dismiss for the period after August 10, 2006 is granted. The Clerk of the Court is directed to close these motions (Docket Nos. 94 and 97). A conference is scheduled for Thursday, January 20, 2011 at 5:00 p.m.

SO ORDERED.